ALLIANCE STEEL, INC., Plaintiff-Appellee, v. CURTIS B. PIERCY *et al.*, Defendants-Appellants (Pre-Engineered Steel, Inc., *et al.*, Defendants).

Fourth District   No. 4—95—0395

Opinion filed January 31, 1996.

GARMAN, J., dissenting.

Frederic L. Kenney (argued), of Winters, Featherstun, Gaumer, Kenney, Postlewait & Stocks, of Decatur, for appellants.

634

David G. Lubben (argued), of Keck, Mahin & Cate, of Peoria, for appellee.

PRESIDING JUSTICE COOK delivered the opinion of the court:
The trial court entered summary judgment in favor of a subcontractor (materialman) who had brought suit to foreclose a mechanic's lien. The owner appeals. We reverse and remand.

The affidavits filed in connection with the motion for summary judgment show the following facts. Curtis B. Piercy owns and operates Piercy Auto Body in Carlock, Illinois. On August 12, 1991, Piercy entered into a contract with Pre-Engineered Steel, Inc. (the contractor), to erect a steel building at Piercy's place of business. Under the contract, Piercy was to pay the contractor $39,000. The contractor in turn entered into a subcontract, August 27, 1991, with Alliance Steel, Inc., to supply the unassembled steel building which would be erected. Under the subcontract, the contractor was to pay Alliance $18,808.

On October 7, 1991, an Alliance truck driver delivered steel building materials to the Piercy jobsite. The Alliance truck driver requested that Piercy pay for the materials on delivery, and Piercy accordingly gave the driver a cashier's check, showing Piercy as the remitter, made payable to the contractor in the amount of $26,605. The check was received on October 8, 1991, by John Herring, Alliance's former accounts supervisor. Herring immediately faxed a copy of the check to the contractor. On the copy of the fax appear the following notations: (1) "Will send airborne to you tonight please return," (2) "Thanks, John," and (3) "20,000." In its brief, Alliance states the record is not clear whether John Herring made all these notes, and suggests that someone in the contractor's office may have written "20,000" after the fax was received. Alliance, however, did not submit any affidavit from Herring.

The contractor received the $26,605 check by airmail on October 9. That same day the contractor prepared and returned to Alliance a check in the amount of $20,000. The $20,000 check was received and negotiated by Alliance on October 9.

The contractor had previously been involved in other projects where Alliance was the supplier of building materials. In October 1991, the contractor owed Alliance more than $500,000 on those projects. Alliance's practice was that, in the absence of directions from the contractor, it would apply payments it received from the contractor at its discretion, usually on the oldest unpaid invoices. Sometime in October 1991, there was a meeting between the contractor and Alliance to discuss the need to bring the contractor current on its unpaid debts. Around this same time, Alliance decided it was going

to start filing liens against the contractor's projects. When Alliance received the contractor's $20,000 check, Alliance did not apply that check to the Piercy account, but instead to two older accounts, Nos. 10796 and 11029.

On January 30, 1992, Alliance mailed a subcontractor's 90-day notice of claim of lien to Piercy. That was more than 90 days after the materials were furnished on October 9, but Alliance's president testified that other materials were furnished later and that the date of last delivery was November 7, 1991. On October 29, 1992, the contractor sent a $500 check to Alliance, with directions to apply it to the Piercy account. Then on December 11, 1992, the contractor sent a letter to Alliance, stating that the $500 check was in error and that the Piercy job was paid in full on October 9, 1991.

Alliance recorded its lien against the Piercy Auto Body real estate on February 20, 1992, then filed this action to foreclose its lien on February 13, 1993. The trial court entered summary judgment in favor of Alliance on February 16, 1995. Piercy appeals.

Alliance argues that Piercy breached his duty under section 5 of the Mechanics Lien Act (Act) (770 ILCS 60/5 (West 1994)) to demand a sworn written statement from the contractor listing the subcontractors and amounts due or to become due each. Alliance suggests that fact alone requires judgment in its favor, although it recognizes that "Piercy could have protected himself and Alliance in a second way, but again did not." That second way would have been to have withheld an amount sufficient to pay Alliance until receiving assurance (perhaps a lien waiver) that Alliance had been paid.

■ The Act attempts to balance rights and duties of owners, contractors, and subcontractors (materialmen). A subcontractor may give the owner written notice of its claim (and thereby protect itself against subsequent disbursements) any time after the subcontractor enters into its contract with the general contractor, but no later than 90 days after the subcontractor's completion of the contract. (770 ILCS 60/24 (West 1994).) Even if the subcontractor never gives notice to the owner, it is the owner's duty, before making any payments, to require the general contractor to provide a sworn written statement listing the subcontractors and amounts due or to become due each. (770 ILCS 60/5, 21 (West 1994).) The fact that the contractor gives a sworn written statement, however, does not afford complete protection to the subcontractor. The owner is protected against subcontractors not listed or amounts understated on the sworn written statement unless those omissions are with the knowledge or collusion of the owner. (770 ILCS 60/27 (West 1994).) A subcontractor who relies on the contractor's sworn written statement accordingly puts his trust in the contractor.

■ The Act provides that the owner shall not be required to pay a greater amount than the contract price "unless payment be made to the contractor *** in violation of the rights and interests of the persons intended to be benefited by this act." (770 ILCS 60/21 (West 1994).) The Act provides that no payments to the contractor shall be regarded as rightfully made, "if made by the owner without exercising and enforcing the rights and powers conferred upon him in sections 5, 21 and 22 of this Act." (770 ILCS 60/32 (West 1994).) That is not to say, however, that every time a subcontractor is not paid in full there is a claim against the owner. The Act does not require that the owner obtain lien waivers before the owner makes any payments. (*Contractors' Ready-Mix, Inc. v. Earl Given Construction Co.* (1993), 242 Ill.. App. 3d 448, 454, 457, 611 N.E.2d 529, 533, 534-35 (where the sworn written statement understated the amount due the subcontractor).) The failure to obtain a contractor's sworn written statement does not result in absolute liability on the part of the owner. As Alliance concedes, there are other steps which an owner may take to protect itself.

Alliance concedes that it could have no complaint if Piercy had included its name on the $26,605 check made payable to the contractor, even if Piercy had not obtained a contractor's sworn written statement. In the present case, it appears that Alliance had the equivalent of its name on the check: the check was delivered into its possession by Piercy, and Alliance was free to (and did) impose any conditions it chose on the contractor's negotiation of that check. Piercy did not make payment to the contractor; he made payment to Alliance, although his check had the contractor's name on it. It is difficult to see how Alliance would have been any better off if Piercy had requested a contractor's sworn written statement before Piercy gave Alliance the $26,605 check made payable to the contractor.

■ It is no defense under the Act that the owner has paid the contractor the amounts due the subcontractor. (*Hudson v. Caterpillar Tractor Co.* (1983), 117 Ill. App. 3d 720, 723, 453 N.E.2d 880, 883.) An owner who simply pays the contractor runs the risk that the contractor will fail to pay the subcontractor. Even if the contractor pays the subcontractor, the owner runs the risk that general payments will not be designated to his account. A particular owner is not entitled to credit for general undesignated payments made by the contractor to the subcontractor, even if the funds are later traced from the owner to the contractor to the subcontractor. (See *Liese v. Hentze* (1927), 326 Ill. 633, 638-39, 158 N.E. 428, 430.) If the contractor does make payment to the subcontractor, however, and designates that the payment be applied to the owner's account, the owner will have a

defense, even though he has not required a contractor's sworn written statement. See *Associated Lumber Industries, Inc. v. Grammer* (1977), 54 Ill. App. 3d 39, 369 N.E.2d 530.

■ The trial court in this case focused on the contractor's $20,000 check to Alliance, concluding that the contractor did not make any specific designation how those funds would be applied. The court may very well be correct that the contractor made no specific designation, although it seems clear Alliance knew where the $20,000 came from. Even where there is no specific designation by the contractor, other circumstances may require the subcontractor to apply the payment to the owner's account. What is most important here is the delivery of Piercy's $26,605 check the previous day, not to the contractor but to Alliance itself. Once it had the $26,605 check in its possession, Alliance had complete power to protect itself on this project, and apparently did so, insisting that it receive $20,000 of the $26,605, and trusting the contractor to forward its share (which the contractor did).

Alliance argues that "it is *** pure speculation that the source of funds for the $20,000 check sent to Alliance by [the contractor] was the $26,605 check payable to [the contractor] by Piercy, and that Alliance 'knew' this was the case." Alliance closes its eyes to the statements contained in the affidavits and the legitimate inferences to be drawn therefrom. Even if Alliance did voluntarily surrender the $26,605 check given it by Piercy, without requiring anything in return from the contractor, Alliance has no further claim against Piercy. A subcontractor whose name is on a check along with the contractor may choose to endorse the check over to the contractor, but he may not then complain that the owner has breached some duty under the Act.

Piercy may be the unwitting beneficiary of Alliance's efforts in this case. It may be that Piercy was unaware that Alliance was a subcontractor and have believed that the contractor was itself fabricating the building. That may explain why, when Alliance's driver demanded payment on delivery, Piercy was ready with a cashier's check but the check had the contractor's name on it. If Alliance had not been so careful to demand payment when materials were delivered to the Piercy jobsite, it is possible that Piercy would have given his check to the contractor, not to Alliance, and when the contractor made payment to Alliance (if it did so), Alliance could have applied that payment to past accounts and then liened the Piercy job. When Alliance made certain that it got the money from Piercy, however, it could no longer take the position that it had not obtained the money from Piercy.

In *Liese* (326 Ill. 633, 158 N.E. 428), a contractor built a house for Hentze, and the subcontractor furnished lumber. The subcontractor notified Hentze the subcontractor was owed $1,212.96, whereupon Hentze obtained a loan and paid $4,000 to the contractor. The contractor immediately wrote a check to the subcontractor in the amount of $1,000, but without any instruction how the $1,000 was to be applied. The subcontractor had other accounts with the contractor and had no reason to believe that the $1,000 was to be applied to Hentze's account. The supreme court held Hentze was not entitled to a credit for the $1,000, because in the absence of a designation by the debtor the creditor could apply the payment as it chose. Alliance points to the following statement: "Where the owner makes payment to a contractor without requiring the statement referred to in the Mechanic's Lien [A]ct[,] he does so at his peril." (*Liese*, 326 Ill. at 638, 158 N.E. at 430.) The peril the court was referring to was that the contractor would either not pay the subcontractor, or the contractor's payment would not designate the account to be credited. The court did not hold there was absolute liability if the owner failed to obtain a contractor's written statement. In *Liese*, the owner would have been entitled to a credit if the contractor had designated how the payment should be applied, even if the owner had not required a contractor's written statement. In *Liese*, the contractor gave the check to the subcontractor, unlike our case where the owner himself gave the check to the subcontractor.

We need not address Piercy's argument that it is fraudulent for a subcontractor, recognizing that it has financial problems with a contractor, to apply current payments from the contractor to old jobs and then lien the current jobs which it knows are the source of those payments.

Our review of the trial court's decision to grant summary judgment is *de novo*. (*Outboard Marine Corp. v. Liberty Mutual Insurance Co.* (1992), 154 Ill. 2d 90, 102, 607 N.E.2d 1204, 1209.) For the reasons stated, we reverse the trial court's order granting summary judgment to Alliance and remand for further proceedings.

Reversed and remanded.

GREEN, J., concurs.

JUSTICE GARMAN, dissenting:

The trial judge made the following findings of fact, which warrant being quoted *in extenso*:

"First, on August 12th of 1991[,] a contract was entered into be-

tween the property owner, Defendant Curtis Piercy, with the contractor for this project, Pre-Engineered Steel, for a $39,000 job that the owner wanted Pre-Engineered Steel to complete for it. A few days later, on August 27th of 1991, the contractor, Pre-Engineered Steel[,] entered into a contract with the Plaintiff [Alliance Steel] as a subcontractor to supply material for this project, and the amount for the material that was to be paid was $18,808. Thereafter, on October 7th of 1991, the Plaintiff in part delivered material to the job site and got from Mr. Piercy a $26,605 check, which was made payable to Pre-Engineered Steel, and the Plaintiff forwarded the check then on to Pre-Engineered Steel after receiving it from Mr. Curtis [Piercy]. On October 9th, two days later, 1991, Pre-Engineered Steel sent to the Plaintiff a $20,000 check. There was no indication or direction on the check itself as to any particular account as to which the check should be applied, and the Plaintiff applied it to an account which was older than the Piercy account. On the 7th of November of 1991, Plaintiff completed its delivery of materials to the job site. On January 31st of 1992, the Plaintiff served notice on Mr. Piercy. It is claimed under this contract on February 20th of 1992, the Plaintiff recorded its lien on August 24th, 1992. Mr. Piercy was served by Pre-Engineered Steel with a document indicating a release on the part of Pre-Engineered Steel and an acknowledgement from Pre-Engineered Steel of full payment by him on the contract with Pre-Engineered Steel. On October 29th, 1992, Pre-Engineered Steel sent a $500 payment to the Plaintiff, which was applied to the Piercy account, and there is a letter dated December 11th, 1992, from Pre-Engineered Steel to the Plaintiff suggesting a belief on the part of Pre-Engineered Steel that its Piercy job with the Plaintiff was paid in full October 9th, 1991. It seems to the Court those are the significant dates and events that occurred in this situation chronologically."

The court granted summary judgment to Alliance on the following grounds: (1) the payment of $20,000, an amount in excess of the contract price between Pre-Engineered and Alliance ($18,808), was contrary to the prior course of dealings between the parties; (2) the amount of the check given to Alliance was $26,605, again in excess of the subcontract between Alliance and Pre-Engineered; (3) the $500 payment—made almost a year after the final delivery—was directed by Pre-Engineered to be applied to the Piercy account, indicating that the earlier $20,000 payment was not meant to be applied to the Piercy account; and (4) equity was on the side of Alliance, because it remained unpaid, so far as the Piercy project was concerned.

The purpose of the Act is to provide extraordinary remedies to

certain classes of contractors and subcontractors. (*First Bank v. Rinaldi* (1994), 262 Ill. App. 3d 179, 187, 634 N.E.2d 1204, 1210.) Once the lien claimant has complied with the statutory requirements, the Act should be liberally construed to carry out its remedial purpose of allowing recovery where the value of the property has been increased by furnishing labor or materials. (*First Bank*, 262 Ill. App. 3d at 187, 634 N.E.2d at 1210.) While the party seeking to enforce a lien must "scrupulously observe[ ]" the terms of the Act (*First Bank*, 262 Ill. App. 3d at 187, 634 N.E.2d at 1210), once this is done, the Act alerts owners of what they should do in order to avoid double liability. *Cabinet Service Tile, Inc. v. Schroeder* (1993), 255 Ill. App. 3d 865, 867, 627 N.E.2d 253, 255.

The record indicates that Piercy did not request the affidavit required by section 5 of the Act and therefore should not escape double liability. Section 5 of the Act provides:

> "It shall be *** the duty of the owner to require of the contractor, before the owner *** shall pay or cause to be paid to the contractor or to his order any moneys or other consideration due or to become due to the contractor, *** *a statement in writing, under oath or verified by affidavit, of the names and addresses of all parties furnishing materials and labor and of the amounts due or to become due to each.*" (Emphasis added.) (770 ILCS 60/5 (West 1992).)

Section 32 of the Act specifically provides:

> "*No payments* to the contractor or to his order of any money or other considerations due or to become due to the contractor *shall be regarded as rightfully made, as against the sub-contractor *** or party furnishing labor or materials, if made by the owner without exercising and enforcing the rights and powers conferred upon him in section*[ ] *5 *** of this Act.*" (Emphasis added.) (770 ILCS 60/32 (West 1992).)

Thus, under section 32 of the Act, Piercy's payment cannot be regarded as "rightfully made." There is no question that Piercy did not obtain the requisite affidavit; therefore, there is no genuine issue of material fact, and the trial court properly granted summary judgment. The fact that Piercy *could have* protected himself by other means is irrelevant.

The case law is emphatic. In *Hudson* (117 Ill. App. 3d at 723, 453 N.E.2d at 883), an owner made payments to a general contractor, failing, as here, to obtain the required affidavits. This court held that even though the owner had to pay more than the total contract price in order to discharge the subcontractor's lien, this was not a defense the owner could raise. Payments made without obtaining the required affidavits are *at the owner's risk*. The unbroken chain of authority for

this rule dates back to at least 1891. See, *e.g., Ambrose v. Biggs* (1987), 156 Ill. App. 3d 515, 509 N.E.2d 614; *Swansea Concrete Products, Inc. v. Distler* (1984), 126 Ill. App. 3d 927, 467 N.E.2d 388; *Deerfield Electric Co. v. Herbert W. Jaeger & Associates, Inc.* (1979), 74 Ill. App. 3d 380, 392 N.E.2d 914; *Barr & Collins v. Seiden* (1954), 3 Ill. App. 2d 115, 120 N.E.2d 380; *Stanley J. Gottschalk Construction Co. v. Carlson* (1929), 253 Ill. App. 520; *Mueller Lumber Co. v. Bollinger* (1911), 160 Ill. App. 402; *Conklin v. Plant* (1889), 34 Ill. App. 264.

I agree that Piercy's predicament is regrettable. However, the law could not be more clear. Piercy exposed himself to double liability when he failed to obtain the required affidavits before making payment to the contractor. Furthermore, I am troubled with the ease with which the majority excuses Piercy's oversight, especially considering the fact that the contract was for construction of his auto body shop. Surely a business owner should not be excused from his failure to follow the provisions of the Act when he is in a position to understand the law as it applies to his business.

The case law cited by the majority in fact supports the grant of summary judgment in this case. For example, in *Liese* (326 Ill. 633, 158 N.E.2d 428), an owner paid a general contractor, who, in turn, paid a subcontractor. The owner, as here, did not ask for the sworn statement required by the Act and, as here, did not provide any directions as to the application of the payment. Under these circumstances, our supreme court held that there was "no basis or reason for deviation from the general rule" set out in the Act. (*Liese*, 326 Ill. at 639, 158 N.E. at 430.) It emphasized:

> "Section 5 *** provides that the owner may protect himself before the payment of money by requiring the contractor to supply a sworn statement concerning the bills of sub-contractors and materialmen. *** Where the owner makes payment to a contractor without requiring the statement referred to in the [Act] he does so at his peril." *Liese*, 326 Ill. at 638, 158 N.E. at 430.

The majority attempts to distinguish *Liese* by pointing out that "the owner would have been entitled to a credit if the contractor had designated how the payment should be applied, even if the owner had not required a contractor's written statement." (277 Ill. App. 3d at 638.) I agree. Here, however, Piercy *did not* designate how the payment should be applied. In fact, he made the $26,605 check payable to Pre-Engineered, not Alliance. He violated his obligations under the Act, and, however unfortunate, must now bear the consequences.

The majority is correct in stating that "other circumstances may require the subcontractor to apply the payment to the owner's ac-

count." (277 Ill. App. 3d at 637.) No such other circumstances are present here. The Act is emphatic that, absent a request for an affidavit, the payment is *wrongful*, as against the subcontractor. The majority appears to reverse the trial court mostly on equitable grounds. However, he who requests equity must do equity. Since Piercy's payment was wrongful, *i.e.*, not rightfully made, equitable relief is inappropriate.

Finally, the majority points out that Alliance "made certain that it got the money from Piercy." (277 Ill. App. 3d at 637.) The record does not support this contention, though. An Alliance driver received a $26,605 check from Piercy on October 7, 1991. This check was payable to Pre-Engineered. Alliance transmitted the check to Pre-Engineered on October 9, 1991. Alliance was due $18,808 for the Piercy job. The same day, October 9, 1991, Alliance received a $20,000 check from Pre-Engineered with no direction as to its application. Over a year later, on October 29, 1992, Pre-Engineered sent a $500 check to Alliance, with directions to apply it to the Piercy account. The record also contains a December 11, 1992, self-serving and contradictory letter from Pre-Engineered to Alliance, in which Pre-Engineered claims that the $500 check was in error. Coupled with a discrepancy between the cost of the Piercy job ($18,808). the amount of the Piercy check ($26,605) and the amount of the payment to Alliance ($20,000), the $500 payment proves that Alliance did not receive the $20,000 payment for the Piercy account.

I see no reason for deviation from the general rule here, nor do I see any special circumstances warranting reversal, and would affirm.